IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JACQUES J. POLAK, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>INTERNATIONAL MONETARY FUND, )<br>)<br>Defendant. )<br>) | Civil Action No. 1:08-CV-01416 (RMU) |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY PENDING JURISDICTIONAL DISCOVERY

Plaintiff Dr. Jacques J. Polak hereby opposes Defendant International Monetary Fund's ("IMF") Motion to Dismiss. As set forth herein, the IMF is <u>not</u> immune from Dr. Polak's common law negligence tort claim. Moreover, Dr. Polak seeks limited jurisdictional discovery regarding Defendant's categorical denial that it has waived immunity, a legal conclusion that cannot be established by a self-serving affidavit.

### Background

Dr. Polak is "a major 20th-Century economist whose pioneering research molded the basic economic approach of the IMF." Dr. Polak enjoyed "a 70-year career as an economist and international civil servant," first with the League of Nations and later as an employee of the IMF, attending the 1944 Bretton Woods Conference as a member of the Dutch delegation. The author of "scores of papers" and several books, Dr. Polak's "most enduring contribution to both economics and the Fund is the economic model that bears his name. The Polak Model explained a country's balance of payments in monetary terms, enabling economists to understand the causes of a country's economic imbalances." In the 1980s, after formally retiring from the IMF, Dr. Polak served as

Director for the Netherlands on the IMF's Executive Board. "In recognition of Polak's contributions, the IMF named its annual research conference for him." (See Attach. A.)

At the Eighth Annual Jacques Polak Research Conference, held at IMF headquarters in Washington, DC, on November 15, 2007, Dr. Polak sustained serious, permanent, debilitating injuries when he fell on steep, uneven stairs that lacked an adequate handrail, in violation of the District of Columbia Building Code. (Compl. ¶¶ 6-10.) The IMF did not give Dr. Polak (or anyone else) any notice or warning of the steep, uneven stairs or lack of an adequate handrail. (Compl. ¶ 11.) Dr. Polak previously led a very active lifestyle, working four days per week, playing tennis and bridge, delivering academic lectures, and serving as the primary caregiver for his wife. (Compl. ¶ 12.) Dr. Polak requires 24-7 medical care (Compl. ¶ 13), which he pays for using his IMF pension. Tragically, Dr. Polak's beloved wife of 70 years, Josephine W. Polak, passed away last month.

It grieves Dr. Polak that he is now forced to sue an organization that represents his life's work and that he served with distinction for decades. The IMF has benefited immensely from Dr. Polak's contributions, and he is proud to have served the IMF. Yet now that Dr. Polak requires the IMF's help, that institution has turned its back on him, refusing to make any reasonable offer to compensate him for losses he has suffered as a direct result of its negligence, refusing to instruct its insurer (Travelers) to do right by him, and hiding behind a dubious claim of immunity.

Such is Dr. Polak's loyalty to the IMF (which thus far has gone in only one direction) that this week he participated in the Ninth Annual Jacques Polak Research Conference, making no mention of the dispute or of the institution's callous and shameful treatment of him.

I.   **The IMF Is Not Immune from Dr. Polak's Common Law Negligence Tort Claim**

   A.   **Defendant's Immunity Derives Exclusively from U.S. Law**

For nearly two hundred years, courts have recognized that a foreign government's immunity is determined exclusively by the laws of the United States—not by the foreign government itself.

Chief Justice Marshall put it bluntly: "The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. . . . All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other source." *The Schooner Exchange v. McFaddon*, 11 U.S. 116, 136 (1812).

Under the International Organizations Immunities Act of 1945 ("IOIA"), public international organizations "shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." 22 U.S.C. § 288a(b). In December 1945 the United States joined the IMF. Pub. L. 79-171, 59 Stat. 512. *See* 22 U.S.C. § 286 (authorizing the President to accept membership in the Fund under the original Articles of Agreement). In July 1946 President Truman designated the IMF as a "public international organization" under the IOIA. Exec. Order No. 9751, 11 Fed. Reg. 7713 (July 11, 1946). Thus, "the Fund's Articles of Agreement—and the immunities provided therein—are now part of the statutory law of the United States." Def.'s Mot. 2. *See also* 22 U.S.C. § 286e-5b (accepting the most recent amendments to the Articles).

Following *Schooner Exchange*, this Court determines the scope of Defendant's immunity according to U.S. law. As part of the statutory law of the United States, Defendant's Articles and the IOIA serve as potential sources of immunity. Precedent from this Court and from the U.S. Court of Appeals for the District of Columbia Circuit is another potential source of immunity. None of these authorities support the conclusion that Defendant is immune from Dr. Polak's common law negligence tort claim.

### B. Under U.S. Law, Defendant Is Immune To The Extent Necessary to Fulfill Its Functions

Traditionally, foreign sovereign immunity was reserved for states only, "[t]he world being composed of distinct sovereignties, possessing equal rights and equal independence . . .." *Schooner Exchange*, 111 U.S. at 136. But after World War II the number of public international organizations, which historically were accountable only to their member states, increased dramatically, leading to "a broad consensus that international organizations are subjects of international law." Steven Herz, *International Organizations in U.S. Courts: Reconsidering the Anachronism of Absolute Immunity*, 31 SUFFOLK TRANSNAT'L L. REV. 471, 483 (Summer 2008).[1]

"The privileges and immunities of international organizations are 'functional,' and, though modeled after those of states, differ from them in some measure, both in conception and content. Unlike states, international organizations are not 'sovereign' and draw on no history of sovereignty and no tradition of sovereign immunity." RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES ch. 6 pt. IV subch. B intro. n. (1987). "It is therefore well-established that an international organization should be afforded immunity based upon its 'functional necessity.' Under the 'functional necessity' doctrine, an organization should enjoy only those immunities that are strictly necessary for it to achieve its organizational objectives." Herz at 474.

The "functional necessity" doctrine is evident in Defendant's own Articles of Agreement (which became statutory law when the United States joined the Fund), in the IOIA legislative history, and in the cases interpreting and applying the IOIA.

---

[1] "Nevertheless, some prominent international organizations, such as the World Bank and the IMF, have long denied that they operate within the rubric of international law, and have traditionally refused to recognize any international legal obligations beyond their charter and treaty obligations, jus cogens requirements, and Chapter VII Security Council resolutions. . . . The IMF . . . remains bound and determined to assert its independence from the majority of international law." Herz at 485-86.

i.  **Functional Necessity in Defendant's Own Articles of Agreement**

The Articles expressly limit the scope of Defendant's immunity to that which is necessary "[t]o enable the Fund to fulfill the functions with which it is entrusted." Article IX of Defendant's Articles of Agreement concerns "Status, Immunities, and Privileges." Section 1 of Article IX states: *"To enable the Fund to fulfill the functions with which it is entrusted,* the status, immunities, and privileges set forth in this Article shall be accorded to the Fund in the territories of each member." (emphasis added) (Attach. B)  At Section 3 of Article IX, the Articles continue: "The Fund, its property and its assets, wherever located and by whomsoever held, shall enjoy immunity from every form of judicial process except to the extent that it expressly waives its immunity for the purpose of any proceedings or by the terms of any contract." Thus, by the terms of its own Articles Defendant is immune from judicial process only to the extent that exercising jurisdiction would impede Defendant from "fulfilling the functions with which it is entrusted."

ii.  **Functional Necessity in the IOIA Legislative History**

The functional necessity doctrine is also evident in the IOIA legislative history. Congress recognized that the IOIA "will not only *protect the official character of public international organizations* located in this country but it will also tend to *strengthen the position of international organizations* of which the United States is a member when they are located or carry on activities in other countries." H. Rep. No. 1203, 79th Cong., 1st Sess. 947 (1945) (emphasis added). In the same vein:

> While the need for such legislation has existed for some time, the problem has become of pressing importance only in the last few years in connection with the *increased activities* of the United States in relation to international organizations. Provisions have been made with respect to the problem of privileges and immunities in the international conferences in connection with the creation of the UNRRA, the International Monetary Fund and the International Bank, the Food and Agriculture Organization of the United Nations, and others. The increased importance of the Pan American Union and its *expanded activities,* will also require the extension of privileges and immunities to this organization which has long had its headquarters in the United States.

S. Rep. No. 861, 79th Cong., 1st Sess. 2 (1945) (emphasis added). When the IOIA was being considered by Congress, public international organizations needed certain privileges and immunities to operate effectively. The IOIA was adopted to give public international organizations the necessary latitude to fulfill their designated functions.

Clearly, Congress did not mistake the IMF for the French Republic or the Kingdom of Denmark, whose status as sovereign, co-equal members of the family of nations entitle them to certain privileges and immunities under the time-honored traditions of international law. To enable Defendant and other public international organizations to function effectively, Congress granted them "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments . . . ." 22 U.S.C. § 288a(b). Thus, Defendant enjoys absolute immunity as necessary to function. But Defendant's immunity does not extend beyond the "functional necessity" intended by the Articles of Agreement and by the 79th Congress in adopting the IOIA.

### iii. Functional Necessity in the IOIA Caselaw

The cases interpreting the IOIA show that an international organization's immunity is limited by its functional necessity. "The United States has accepted without qualification the principles that international organizations must be *free to perform their functions* and that no member state may take action to hinder the organization." *Broadbent v. Org. Am. States*, 628 F.2d 27, 34 (D.C. Cir. 1980) (emphasis added).

The primary example of an activity that is necessary to the functioning of a public international organization is personnel management. This Court and the Court of Appeals repeatedly have held that public international organizations, including Defendant, are immune from claims deriving from employment disputes. In *Broadbent*, the Court of Appeals recognized that "[a]n attempt by the courts of one nation to adjudicate the personnel claims of international civil servants would entangle those courts in the internal administration of those organizations." 628 F.2d at 35.

And in *Mendaro v. World Bank* the Court of Appeals elaborated, "[i]t is well established under international law that 'an international organization is entitled to such privileges and such immunity from the jurisdiction of a member state as are *necessary for the fulfillment of the purposes of the organization*, including immunity from legal process, from financial controls, taxes and duties.'" 717 F.2d 610, 615 (D.C. Cir. 1983) (emphasis added) (quoting RESTATEMENT (REVISED) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 464(1) (1983)). Rejecting the plaintiff's Title VII sexual harassment suit, the Court of Appeals explained that "[o]ne of the most important protections granted to international organizations is immunity from suits by employees of the organization in actions arising out of the employment relationship. . . . [T]he purpose of immunity from employee actions is rooted in the need to protect international organizations from unilateral control by a member nation over the activities of the international organization within its territory." *Id.* Similarly, in *Weinstock v. Asian Development Bank* this Court quoted the functional necessity doctrine from the Restatement to reject the plaintiff's "allegations [ ] based entirely on his employment relationship with the ADB." 2005 U.S. Dist. LEXIS 16870, at *13 (D.D.C. July 13, 2005).

Undoubtedly, and consistent with the functional necessity principle, Defendant is immune from all employment-type claims. *See, e.g., Inversora Murten, S.A. v. Energoprojekt-Niskogradnja, Ltd.*, 264 Fed. App'x 13 (D.C. Cir. 2008) (World Bank not subject to "non-wage garnishment proceedings initiated by third-party judgment creditors of member nations' contractors"); *Aguado v. Inter-Am. Dev. Bank*, 85 Fed. App'x 776 (D.C. Cir. 2004) ("The appellant has failed to show that this suit furthers the Bank's objectives so as to distinguish her claims from other employment disputes."); *Dujardin v. Internat'l Bank for Reconstruction & Dev.*, 9 Fed. App'x 19 (D.C. Cir. 2001) (World Bank immune from defamation suit brought by "former employee of a borrower of the World Bank, whom the Bank allegedly recruited to work for the borrower and to whom it promised employment benefits"); *Fazzari v. Inter-Am. Dev. Bank*, 2000 U.S. App. LEXIS 38664 (D.C. Cir. Nov. 16, 2000) (rejecting

appellant's argument "that his status as a retiree distinguishes his claim from those that arise out of an employment relationship"); *Tuck v. Pan Am. Health Org.*, 668 F.2d 547 (D.C. Cir. 1981) ("Tuck's claims arise from the PAHO's supervision of its civil service personnel and from its provision and allocation of office space."); *Morgan v. Internat'l Bank for Reconstruction & Dev.*, 752 F. Supp. 492 (D.D.C. 1990) (doctrine applies equally to employee of a temporary employment agency; "That the present suit concerns an employment relationship cannot be questioned."); *Donald v. Orfila*, 618 F. Supp. 645 (D.D.C. 1985) ("…defendant, the former Secretary General of the Organization of American States, is absolutely immune from liability for actions resulting in the termination of the plaintiff's employment."); *Kissi v. de Laroisiere*, No. 82-1267, at 2 (D.D.C. June 23, 1982) (Green, J.) (employment discrimination claim brought against Defendant's managing director).

The plaintiffs in *Broadbent* and *Mendaro* both argued that the IOIA was amended by the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602-1611. They argued that the IOIA incorporated the FSIA immunity exceptions, §§ 1605(a)(1)-(6), specifically the commercial activity exception, § 1605(a)(2). But the Court of Appeals did not reach this question in either case, holding that employment is not as a commercial activity anyway, and that public international organizations enjoy the same absolute immunity against employment claims as foreign governments. *Mendaro*, 717 F.2d at 616-17; *Broadbent*, 628 F.2d at 35.

In *Atkinson v. Inter-American Development Bank*, the Court of Appeals rejected the plaintiff-appellant's suit to garnish the wages of her ex-husband, who was an employee of a public international organization. 156 F.3d 1335 (1998). The court held that a "garnishment proceeding would not come within" the FSIA commercial affairs exception, because the appellant "would need to show the amount of the debt owed by [her ex-husband] to her and the judgment giving rise to that debt. To levy the writ on the Bank as garnishee, appellant would have to demonstrate that the Bank owed wages to [her ex-husband.] Neither of these elements relates to a commercial activity of

the Bank." *Id.* at 1343 (citations omitted). In lengthy dicta[2], the Court of Appeals stated that the IOIA was not amended by the FSIA and that when it adopted the IOIA "Congress' intent was to adopt that body of law only as it existed in 1945—when immunity of foreign sovereigns was absolute." *Id.* at 1341. As discussed at length in Section I.C.iii *infra*, foreign sovereigns did not enjoy absolute immunity in 1945, and Dr. Polak could have brought a common law negligence tort claim against a foreign sovereign at that time. Erroneous or not, this dicta is not controlling on the Court in the present case, which does not involve an employment claim of any kind.

### C. Under The Functional Necessity Doctrine, Defendant Is Not Immune From Dr. Polak's Common Law Negligence Tort Claim

Defendant is not immune from Dr. Polak's claim for three reasons: the immunity Defendant asserts here is not necessary to fulfill its functions; under the applicable precedent in this Court, Defendant's immunity does not extend to Dr. Polak's claim; and, when the IOIA was enacted in 1945, foreign governments were not immune from claims like Dr. Polak's.

#### i. Defendant does not need immunity from common law negligence tort claims

"Under the 'functional necessity' doctrine, an organization should enjoy only those immunities that are strictly necessary for it to achieve its organizational objectives." Herz at 474. Like foreign governments, public international organizations enjoy absolute immunity from employment-type claims, because as this Court and the Court of Appeals have explained repeatedly, allowing public international organizations to manage their personnel is crucial to the organization's day-to-day functioning.

But Defendant does not require immunity from common law negligence tort claims. "From its early days, the United Nations carried public liability insurance against personal injury and other such routine tort claims. The insurer negotiated claims and defended the organization in any

---

[2] Dicta being defined, *inter alia*, as "language unnecessary to a decision." *Lawson v. United States*, 176 F.2d 49, 51 (D.C. Cir. 1949).

litigation, so no issue of jurisdictional immunity arose. When insurance premiums in the United States rose sharply in the 1980s, the U.N. General Assembly adopted a resolution that limited the tort liability of the United Nations for acts or omissions in the Headquarters District in New York to compensation for plaintiff's actual costs, plus no more than $100,000 for pain and suffering, and excluded liability for punitive damages." Michael Singer, *Jurisdictional Immunity of International Organizations: Human Rights and Functional Necessity Concerns*, 36 VA. J. INT'L L. 53, 85-86 (Fall 1995). It has been the UN's "practice to waive immunity for the purpose of suit" for accidents in the UN Headquarters District. Alice Ehrenfeld, *United Nations Immunity Distinguished from Sovereign Immunity*, 52 AM. SOC'Y INT'L L. PROC. 88, 93 (1958). "Indeed, the principle that international organizations may be internationally responsible for their tortious acts is now so well accepted that it is considered part of customary international law." Herz at 486.

Like Defendant, the UN is a public international organization. *See* Ex. Or. No. 9698, 11 Fed. Reg. 1809 (Feb. 19, 1946) (designating the UN as a public international organization under the IOIA). Like the UN, Defendant has a general insurance carrier (Travelers). The UN has many more employees than Defendant, not to mention a Headquarters District covering 18 acres in Manhattan that is traversed by thousands of people every day. Yet the UN has functioned for more than 50 years without immunity from personal injury claims. Clearly, Defendant also does not need immunity to fulfill its mission, which is much narrower and more specialized than the UN's.

> ii.   **Under past decisions of this Court and the Court of Appeals, Defendant's immunity does not extend to Dr. Polak's claim**

This Court pointedly recognized the limits of the immunity afforded by the functional necessity doctrine in *Lutcher S.A. Celulose E Papel Candoi v. Inter-American Development Bank*, 253 F. Supp. 568 (D.D.C. 1966). There, the plaintiff sought "to enjoin the Inter-American Development Bank from augmenting a loan to one of plaintiffs' competitors," arguing that the Bank "ignored certain alleged market conditions and that if consummated, the additional loan to plaintiffs'

competitor would not be a prudent act." *Id.* at 569. The Court upheld immunity "[w]here delicate, complex issues of international economic policy are involved," but recognized that such cases "are vastly different from cases involving simple torts and contracts." *Id.* at 570. The Court acknowledged that the Inter-American Development Bank, a public international organization just like Defendant, "has been sued in previous situations: where a customer fell on the floor, where there was an alleged breach of a contractual relationship with a coffee shop, and where workmen's compensation was involved." *Id.* (citing cases filed in this Court).

Just as this Court recognized in *Lutcher* that the IADB is not immune from claims "involving simple torts and contracts," neither is Defendant immune from Dr. Polak's common law negligence tort claim. Further, like Defendant, the IADB's Articles of Agreement contains a functional immunity statement that is nearly identical to Defendant's: *"To enable the Bank to fulfill its purpose and the functions with which it is entrusted,* the status, immunities, and privileges set forth in this article shall be to the Bank in the territories of each member." Art. XI, Sec. I ("Status, Immunities and Privileges – Scope of Article") (emphasis added) (Attach. C).

The more recent case of *Olem v. International Bank for Reconstruction and Development*, 95-cv-855 (D.D.C. 1995) (Greene, J.), further illustrates that Defendant is not immune here. (Attach. D.) In *Olem*, the plaintiff sued the World Bank for the wrongful death of her late husband, a consultant who was presumed dead after his plane disappeared over Bolivia. (Attach. E.) The World Bank moved to dismiss, claiming immunity under the IOIA. In response, Mrs. Olem argued that because under *Mendaro* the IOIA creates immunity only for "internal employment practices" (citing *Morgan*, 752 F. Supp. at 494), jurisdictional discovery was needed regarding her late husband's relationship with the World Bank. (Attach. F.) In granting Mrs. Olem's motion (Attach. G), the district court implicitly acknowledged the limits of IOIA immunity: if the relationship was not sufficiently close to make Mrs. Olem's claim an "internal employment matter," then the World Bank was not immune

under the IOIA. Here, Dr. Polak's common law negligence tort claim is not brought under any contract and is not based on any relationship with the IMF. Following this Court's order in *Olem* (which eventually settled), Defendant's motion should be denied, or at the very least Plaintiff's motion for stay pending jurisdictional discovery should be granted.

And in *Rendall-Speranza v. Nassim*, the Court held the World Bank's immunity did not extend to the plaintiff's assault and battery claims. 932 F. Supp. 19 (D.D.C. 1996), *rev'd on other grounds*, 107 F.3d 913 (D.C. Cir. 1997). To reach this conclusion, the Court held that the IOIA incorporates the FSIA, including the FSIA tort exception to foreign sovereign immunity, 28 U.S.C. § 1605(a)(5).[3] Foreign sovereigns indisputably are liable for common law negligence tort claims deriving from everyday accidents occurring on embassy property. *See Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31 (D.D.C. 2002); *Olson v. Republic of Singapore*, 636 F. Supp. 885 (D.D.C. 1986). Following *Lutcher*, *Olem* and *Rendall-Speranza*, Defendant's motion to dismiss should be denied.

In *United States v. BCCI Holdings, S.A.*, the Court of Appeals treated the OAS "like any other bank depositer." 73 F.3d 403, 404 (D.C. Cir. 1996). OAS sought to recover $10,000 deposited with a bank that pled guilty to RICO charges and forfeited its assets to the federal government. "[N]otwithstanding its status as an international organization," the OAS was not immune from the rule that "bank depositors, as general creditors, have no interest in the specific accounts to which their deposits might be traced, only in the defendant's estate as a whole . . . ." *Id.* at 404, 405 (quoting *United States v. BCCI Holdings*, 46 F.3d 1185 (D.C. Cir. 1995)). Similarly, the IOIA does not shield Defendant from local zoning laws. *See Pan Am. Health Org. v. Montgomery County*, 657 A.2d 1163 (Md. Ct. App. 1995). These cases further illustrate that the IOIA privileges and immunities are limited by the principle of functional necessity.

---

[3] In the *Atkinson* dicta, the Court of Appeals noted its "disapproval" of *Rendall-Speranza*. 156 F.3d at 1342 n.6. Dr. Polak maintains that the IOIA does incorporate the FSIA and its several immunity exceptions, as this is the clear holding of *Rendall-Speranza*.

### iii. Defendant is not immune from Dr. Polak's claim under the law of foreign sovereign immunity as of 1945

In the *Atkinson* dicta, the Court of Appeals stated that Congress intended for public international organizations to enjoy the same level of immunity that foreign sovereigns enjoyed in 1945, when the IOIA was adopted. *See* 156 F.3d at 1341-42. But the Court of Appeals mistakenly believed that "immunity of foreign sovereigns was absolute" in 1945. This incorrect statement leads Defendant to conclude erroneously that it "enjoys absolute immunity from suit." Def.'s Mem. 9.

Until 1976, when FSIA was adopted, courts "deferred to the decisions of the political branches -- in particular, those of the Executive Branch -- on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). "Until 1952, the State Department *ordinarily* requested immunity in all actions against friendly foreign sovereigns. But in the so-called Tate Letter, the State Department announced its adoption of the 'restrictive' theory of foreign sovereign immunity. Under this theory, immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Id.* at 486-87 (emphasis added). The "restrictive theory" of immunity was codified as the FSIA commercial activity exception. *See* 28 U.S.C. § 1605(a)(2).

The *Atkinson* wrongly court assumed that prior to issuing the Tate Letter in 1952, the Department of State always urged courts to grant immunity for all claims against foreign governments, and that courts always followed the Department's instructions. This is incorrect.

"[A]t the time the IOIA was passed, there was a clear trend away from absolute sovereign immunity. . . . Foreign countries were increasingly adopting this restrictive view, and it had been incorporated into several important international conventions. Indeed, the State Department had long believed that foreign sovereign immunity should not be available for commercial activity, and had declined to assert immunity for U.S. government-owned merchant vessels in foreign courts."

Herz at 500-02. Writing in 1943, two years before the IOIA was adopted, another commentator observed, "The Government of the United States in dealing with international claims involving damage to private citizens and private vessels caused by collisions with public vessels appears clearly to have committed itself to the principle that a nation is responsible for such damage." 5 GREEN HAYWOOD HACKWORTH, DIGEST OF INTERNATIONAL LAW 476 (1943).

Crucially, two Supreme Court cases immediately preceding the adoption of the IOIA undercut the *Atkinson* court's erroneous assertion that the "immunity of foreign sovereigns was absolute" in 1945. *See Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945); *Ex parte Republic of Peru*, 318 U.S. 578 (1943). In a breach of contract case against a vessel owned by the Peruvian government, the Supreme Court held that courts must follow the State Department's instructions regarding the immunity of a foreign government: "the judicial seizure of the vessel of a friendly foreign state is so serious a challenge to its dignity, and may so affect our friendly relations with it, that courts are required to accept and follow the executive determination that the vessel is immune. . . . Upon recognition and allowance of the claim by the State Department and certification of its action presented to the court by the Attorney General, it is the court's duty to surrender the vessel and remit the libelant to the relief obtainable through diplomatic negotiations." *Peru*, 318 U.S. at 588. This marked a 180-degree reversal from *Berizzi Brothers Co. v. Steamship Pesaro*, 271 U.S. 562 (1926), when the Court held that a commercial vessel owned by a foreign government was entitled to absolute immunity—disregarding the State Department's recommendation that the *Pesaro* was not immune. *See* 2 GREEN HAYWOOD HACKWORTH, DIGEST OF INTERNATIONAL LAW 429 (1940) (letter from Secretary of State Lansing recommending against immunity for the *Pesaro*).[4]

---

[4] The roots of the commercial activity exception to sovereign immunity can be found in *Schooner Exchange*: "A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual . . .." 111 U.S. at 145.

14

Two years later—but 10 months before the IOIA was passed by Congress—in *Hoffman* the Supreme Court held that the *Baja California*, a commercial vessel owned by the Mexican government, was not immune "for damage alleged to have been caused when the Baja California negligently caused her tow to collide with [Hoffman's ship] in Mexican waters." 324 U.S. at 31. The State Department took no position on the *Baja California*'s immunity. *Id.* at 32.

*Peru* and *Hoffman* undercut the rationale for the dicta in *Atkinson*. First, immediately prior to the IOIA's adoption, "the Court completed the transformation of the law of foreign sovereign immunity from a judicial question of law [*Berrizi Bros.*] to a political question of diplomacy [*Peru*]." Hertz at 508. And in *Hoffman*, decided just 10 months before the IOIA was adopted, the State Department declined to recommend immunity for a negligence claim.

When the IOIA was adopted, following *Peru* courts deferred to the State Department's recommendation regarding foreign sovereign immunity. *Hoffman*, a negligence claim like Dr. Polak's, illustrates that the State Department did not always recommend immunity and that courts did not always grant it. If Dr. Polak had been injured under similar circumstances at a foreign embassy located in Washington in 1945, after *Hoffman* was decided in February but before the IOIA was enacted in December, considering *Hoffman* the foreign government could not reasonably have expected the State Department to recommend immunity. The *Atkinson* court thus erred in stating that "immunity of foreign sovereigns was absolute" when the IOIA was adopted. 156 F.3d at 1341. Even accepting *arguendo* that the IOIA adopts the law of foreign sovereign immunity as of 1945, it does not follow that Defendant is immune here. Defendant's motion to dismiss should be denied.

II.     **Dr. Polak Seeks Jurisdictional Discovery Regarding Defendant's Categorical Denial Of Waiver**

Where, as under the IOIA and the FSIA, "immunity involves protection from suit, not merely a defense to liability, more than the usual is required of trial courts in making pretrial factual

and legal determinations." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990). "Since entitlement of a party to immunity from suit is such a critical preliminary determination, the parties have the responsibility, and must be afforded a fair opportunity, to define issues of fact and law, and to submit evidence necessary to the resolution of the issues." *Id.* (citation omitted) Thus, regarding Defendant's motion to dismiss under the IOIA, this Court "must do more than just look to the pleadings to ascertain whether to grant the motion to dismiss." *Id.*

In an affidavit attached to its motion, Defendant categorically denies that it has waived whatever immunity it may enjoy. But whether Defendant has waived, expressly or impliedly, "the Fund's immunity from judicial process with respect to the above-captioned litigation, with respect to personal injury suits generally, or by the terms of any contract with Plaintiff Jacques J. Polak," is a legal question that can only be answered by proving facts; it is not a fact that can be proved by an affidavit attached to a motion to dismiss. *See, e.g., Foremost Guaranty Corp. v. Public Equities Corp.*, 1988 U.S. Dist. LEXIS 12642, *16 n.13 (S.D.N.Y. Nov. 9, 1988) (affidavit states "'[a]t no time did the corporation engage in any activity, as contemplated by the New York C.P.L.R., which would constitute grounds for permitting New York to exercise jurisdiction over the transaction.' This is, of course, a legal conclusion and the affidavit does not present facts sufficient to refute the prima facie case of a conspiracy established by Public.") (citation omitted).

Defendant's claim of total immunity from tort suits is belied by the fact that it has a general insurance carrier (but has not provided Dr. Polak with a copy of this insurance policy). It stretches credulity to believe that Defendant, a major international organization with thousands of employees and a large headquarters complex, has never faced a common law negligence tort claim similar to Dr. Polak's in the half-century since it was founded—how were these claims resolved? Defendant is not immune from local zoning laws—was the subject of Defendant's purported immunity ever raised with the District of Columbia, or with any of the architects or contractors involved in the

16

construction of Defendant's headquarters generally, or specifically of the room where Dr. Polak fell? Such factual questions "can only be resolved through appropriate jurisdictional discovery." *Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230, 237 (D.D.C. 2005).

Assuming *arguendo* that the Court finds Defendant immune under the IOIA, Dr. Polak proposes to stay the action to conduct limited discovery on the issue of Defendant's immunity, per the limited interrogatories and "Request for Production of Documents and Things" attached to Plaintiff's motion. Consistent with *Wyatt v. Syrian Arab Republic*, the "the scope of [Dr. Polak's] proposed discovery plan is reasonably limited to the scope of jurisdictional discovery," 2006 WL 1328263 (D.D.C. Apr. 27, 2006) (allowing jurisdictional discovery against a defendant-foreign sovereign, in the form of interrogatories and request for production of documents), *aff'd*, 266 Fed. App'x 1 (D.C. Cir. 2008). Dr. Polak's proposed jurisdictional discovery is "carefully controlled and limited" to the narrow issue of Defendant's immunity, which will help to determine this Court's jurisdiction. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Dr. Polak's proposed limited jurisdictional discovery will not be "unnecessarily costly or time-consuming" for Defendant. *Beecham v. Socialist People's Libyan Arab Jamahiriya*, 245 F.R.D. 1, 3 (D.D.C. 2007). Following these cases and *Olem*, Plaintiff's motion for stay pending jurisdictional discovery should be granted.

## Conclusion

For the foregoing reasons, Dr. Polak respectfully requests that the Court DENY Defendant's motion to dismiss, and GRANT Plaintiff's motion for stay pending jurisdictional discovery.

Respectfully submitted,

/s/ Benjamin G. Chew
Benjamin G. Chew (DC Bar #418577)
John C. Hilton (DC Bar # 980801)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
bchew@pattonboggs.com
jhilton@pattonboggs.com

*Counsel for Plaintiff Dr. Jacques J. Polak*

Dated:  November 14, 2008

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of November, 2008, I served the foregoing PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY PENDING JURISDICTIONAL DISCOVERY, with all attachments, via the Court's electronic system on Defendant's counsel, as follows:

> Patrick J. Carome, Esq. (DC Bar No. 385676)
> Christopher E. Babbitt, Esq. (DC Bar No. 982508)
> WILMER CUTLER PICKERING HALE and DORR LLP
> 1875 Pennsylvania Avenue, N.W.
> Washington, DC  20006
> Telephone: (202) 663-6000
> patrick.carome@wilmerhale.com
> christopher.babbitt@wilmerhale.com
>
> Christopher E. Hassell, Esq. (DC Bar No. 291641)
> BONNER KIERNAN TREBACH & CROCIATA, LLP
> 1233 20th Street, N.W.
> Suite 800
> Washington, DC  20036
> Telephone: (202) 712-7000
> chassell@bktc.net

> /s/ Benjamin G. Chew
> Benjamin G. Chew

4990305